## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SOUND COMMUNITY BANK, on behalf of itself and all others similarly situated, | : Case No: |
| | : |
| Plaintiff, | : **CLASS ACTION COMPLAINT** |
| | : |
| v. | : JURY TRIAL DEMANDED |
| | : |
| THE HOME DEPOT, INC., | : |
| | : |
| Defendant. | : |

Comes the Plaintiff Sound Community Bank ("Plaintiff"), acting individually and on behalf of all other persons similarly situated, and for its Complaint and demand for jury trial states and alleges as follows:

## INTRODUCTION

1.    This is a class action on behalf of banks, credit unions and other financial institutions that suffered injury as a result of a massive security breach, extending from April 2014 until mid-September 2014, that compromised the sensitive financial data of at least 56 million Home Depot customers (hereinafter, the "Home Depot Data Breach").  Specifically, third parties managed to deploy commonplace malicious software ("malware") and abscond with  customers'

names, credit and debit card numbers, card expiration dates, and card verification values ("CVVs"), as well as the states and ZIP codes of the stores associated with individual card transactions.

2.      As alleged herein, this data breach was made possible only because Home Depot – one of the nation's largest retailers – failed to maintain adequate security protocols.  Indeed, in the weeks following the Home Depot Data Breach, multiple former employees have come forward and presented evidence of a company culture oblivious to the need for adequate IT security, with upper level executives dismissing concerns by stating "We sell hammers."

3.      In an effort to prevent a mass exodus of customers, Home Depot has taken pains to "emphasize that [consumers] will not be liable for any fraudulent charges" stemming from the Home Depot Data Breach.[1]  What this statement omits is the fact that it is the nation's financial institutions – and not Home Depot – ensuring that this is the case.

4.      Plaintiff, along with all other financial institutions making up the proposed Class, has incurred costs, and will incur future costs, associated with protecting its customers' accounts, particularly in the form of reissuing payment cards to replace payments cards rendered valueless and useless by Home Depot's

---

[1] "Customer Update on Payment Breach." (available at
https://corporate.homedepot.com/MediaCenter/Pages/Statement1.aspx)

acts and omissions, providing notice to customers, and refunding fraudulent charges associated with bank accounts of customers who used their cards at Home Depot during the Home Depot Data Breach.  In addition, the Home Depot Data Breach has caused, and will continue to cause, Plaintiff and the Class to lose revenue as a result of a decrease in card usage after the breach was disclosed to the public.

5.    At present, fraudulent charges stemming from the breach are estimated to be between two and three billion dollars, with an average of $332 in fraudulent charges ascribable to each stolen card.[2]

6.    As alleged herein, the injuries to Plaintiff and the Class were – and continue to be – directly caused by Defendant's failure to maintain adequate security for customers' financial data, including credit and debit card data, personally identifying information, and store location information.

7.    Plaintiff brings this class action on behalf of all financial institutions – including banks and credit unions – in the United States that have had the confidential financial data associated with their customers' accounts – including but not limited to customer names, credit and debit card numbers, card expiration

---

[2] Mitch Lipka, "Home Depot Hack Could Lead to $3 Billion in Fake Charges." CBS (Sep. 16, 2014) (available at http://www.cbsnews.com/news/credit-monitoring-company-home-depot-breach-could-result-in-2b-in-fraud/).

dates, CVVs, and the states and ZIP codes of the stores associated with individual card transactions. – compromised as a result of the Home Depot Data Breach.

8.     Plaintiff additionally seeks to represent a Sub-Class of all financial institutions – including banks and credit unions – in Washington that have had the confidential financial data associated with their Washington-resident customers' accounts – including but not limited to customer names, credit and debit card numbers, card expiration dates, CVVs, and the states and ZIP codes of the stores associated with individual card transactions. – compromised as a result of the Home Depot Data Breach.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class defined below, many of which are citizens of a different state than Defendant, including Plaintiff, which is a citizen of Washington.  Defendant is a citizen of Delaware, where it is incorporated, and Georgia, where its principal place of business is located.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendant Home Depot resides in this judicial district, regularly transacts business

4

in this District, and a substantial part of the events giving rise to this Complaint arose in this District.

## PARTIES

11.    Plaintiff is a state-chartered commercial bank headquartered in Seattle, Washington.  It provides banking services for both individual and business customers throughout the State of Washington.  Plaintiff's customers had their personal and financial information stolen as a result of the Home Depot Data Breach.

12.    Defendant The Home Depot, Inc. is a Delaware corporation with its principal place of business located in Atlanta, Georgia.  Home Depot operates a chain of retail stores that sell a wide variety of merchandise, including tools, home goods, and construction supplies.  Home Depot operates over 2,200 stores in the United States.

## GENERAL ALLEGATIONS

13.    Home Depot is a major retailer of products and services related to construction and home improvement, with 2,200 stores across America.

14.    On September 2, 2014, noted security reporter Brian Krebs released a post on his website stating that multiple banks were seeing evidence of a massive

data breach suffered by Home Depot.  Large batches of stolen credit and debit card credentials began appearing on the black market website rescator.cc.[3]

15.    When the data (specifically, the zip codes associated with each card) were downloaded and cross-referenced with Home Depot locations throughout the country, there was a 99.4% overlap, indicating that (1) the thieves acquired the credentials through Home Depot and (2) the breach affected most or all of Home Depot's stores in the U.S.[4]

16.    The same day as Krebs' post, Home Depot confirmed that it was investigating "unusual activity," but offered no further details.[5]

17.    It was not until September 8 that the company finally admitted to the breach and confirmed that the majority of stores in North America were affected (present estimates implicate 1,700 of the 2,200 U.S. stores).[6]

---

[3] Brian Krebs, "Banks: Credit Card Breach at Home Depot." Krebs On Security (Sep. 2, 2014) (available at http://krebsonsecurity.com/2014/09/banks-credit-card-breach-at-home-depot/).

[4] Brian Krebs, "Data: Nearly All U.S. Home Depot Stores Hit." Krebs On Security (Sep. 3, 2014) (available at http://krebsonsecurity.com/2014/09/data-nearly-all-u-s-home-depot-stores-hit/).

[5] Krebs, footnote 3, *supra*.

[6] Shelly Banjo and Danny Yadron, "Home Depot Confirms Data Breach." The Wall Street Journal (Sep. 8, 2014) (available at http://online.wsj.com/articles/home-depot-confirms-data-breach-1410209720?mod=djem10point).

18.    At present, experts believe that the Home Depot Data Breach lasted for five months – from April through September of this year – and at present Home Depot states that 56 million cards have been compromised.[7]  However, at these preliminary stages, it is unlikely that the full scope of the breach has been uncovered, or even that Home Depot has managed to contain the damage.  Indeed, Brian Krebs reports that thieves were *still* stealing credit and debit card data on September 7, *five days after the breach was announced*.[8]

19.    Further, it is a certainty that thieves not only *have* these items of information, they are also actively *selling* these data on the black market, for purposes of identity theft and bank fraud.  The depth and breadth of the information acquired makes such sales particularly attractive: the website identified in Brian Krebs' initial story, rescator.cc, promoted the stolen card data as having a "valid rate: 100%," and the fact that thieves also have ZIP code and store location information enables a putative fraudster to make same-state purchases, thus doing an end-run around the most common fraud alerts and defenses financial

---

[7] Robert Lemos, "Home Depot Estimates Data on 56 Million Cards Stolen by Cybercriminals." Ars Technica (Sep. 18, 2014) (available at http://arstechnica.com/security/2014/09/home-depot-estimates-data-on-56-million-cards-stolen-by-cybercrimnals/).

[8] Brian Krebs, "Home Depot: 56M Cards Impacted, Malware Contained." Krebs On Security (Sep. 18, 2014) (available at http://krebsonsecurity.com/2014/09/home-depot-56m-cards-impacted-malware-contained/).

institutions might use (*e.g.*, blocking out-of-state transactions on a card known to be compromised).[9]

**Defendant's Conduct Has Harmed Plaintiff and Class Members**

20.   Plaintiff and Class members are financial institutions that issue payment cards, including debit and credit cards, and/or perform, facilitate, or support card issuing services on behalf of their customers.   Plaintiff's customers used these payment cards to make purchases at Home Depot stores during the period of the Home Depot Data Breach.

### a. Home Depot Knew or Should Have Known of Its Vulnerability to Theft of Consumer Financial Information

21.   As more facts emerge, it becomes apparent that Home Depot was critically negligent in maintaining adequate security protocols and from heeding the lessons of similarly-situated retailers.   While the Company has publicly referred to the suspected malware used in the Home Depot Data Breach as "unique" and "custom-built," it appears that they were infected with a variant of "BlackPOS"/"Kaptoxa," the same software used to siphon data in the massive (and well-documented and well-publicized) Target data breach of 2013.[10]

---

[9] Krebs, footnote 3, *supra*.

[10] Brian Krebs, "Home Depot Hit by the Same Malware as Target." (Sep. 7, 2014) (available at http://krebsonsecurity.com/2014/09/home-depot-hit-by-same-malware-as-target/).

22.    Since the news of the Home Depot Data Breach has been made public, multiple current and former Home Depot employees have emerged detailing a slew of failings in news accounts.  Among them:

    a)  **"C-Level Security"** – Two former managers have come forward and stated that Jeff Mitchell, the information security chief, told them to settle for "C level security" because infrastructure upgrades would be costly and might disrupt the operation of critical business systems.  The culture was so frustrating in the information security department that dozens of employees left the department in the last three years (the team, at its strongest, numbered fewer than 50 employees).[11]  When employees requested additional security training and equipment, managers denied the request with the explanation, "We sell hammers."[12]

    b)  **No Encryption** – *Home Depot did not encrypt customer card data used in point-of-sale ("POS") transactions*.  The Company's in-

---

[11] Ben Elgin, Michael Riley, and Dune Lawrence, "Former Home Depot Managers Depict 'C-Level' Security Before the Hack." Businessweek (Sep. 12, 2014) (available at http://www.businessweek.com/articles/2014-09-12/home-depot-didnt-encrypt-credit-card-data-former-workers-say).

[12] Julie Creswell and Nicole Perlroth, "Ex-Employees Say Home Depot Left Data Vulnerable." The New York Times (Sep. 20, 2014) (available at http://www.nytimes.com/2014/09/20/business/ex-employees-say-home-depot-left-data-vulnerable.html).

store payment system was not set up to encrypt these data in the period prior to and during the breach.  The Company purchased a tool to encrypt customer payment data this year, but to date they have not finished implementing it.[13]

c) **Outdated Software** – Home Depot had the outdated Windows XP Embedded Service Pack 3 (Windows XPe SP3) installed on its POS terminals.  This operating system, last updated in 2009, is three generations old and is significantly more susceptible to security exploits than current-generation operating systems.[14]

d) **Substandard Internal Auditing Practices** – The Company did not perform network behavior monitoring, so they could not have detected unusual network traffic coming from POS terminals. While the Payment Card Industry ("PCI") Security Standards Council requires security scans at least once a quarter, and third-party security audits, Home Depot only conducted vulnerability scans irregularly, and even then only on a small number of

---

[13] Elgin, *et al*, footnote 11, *supra*.

[14] Jason Mick, "Appalling Negligence: Decade-Old Windows XPe Holes Led to Home Depot Hack." The Daily Tech (Sep. 8, 2014) (available at http://www.dailytech.com/Appalling+Negligence+DecadeOld+Windows+XPe+Holes+Led+to+Home+Depot+Hack/article36517.htm).

stores. Two former Home Depot IT employees said that the security team was *prevented* from checking a number of systems handling customer data.[15]

e)  **Ignored Advice From Independent Auditors** – From August 2013 to February 2014, consultants at Symantec urged Home Depot to enable Endpoint Protection, an intrusion prevention feature that Home Depot refused to enable on its systems.  Similarly, Home Depot switched off Symantec's Network Threat Protection firewall in favor of the one packaged with its outdated Windows XP operating system.[16]

f)  **Criminal Employees in Key Positions** – In the wake of the breach, it has come to light that Home Depot's Senior Architect for IT Security had a history of cybersabotage, to such an extent that he was sentenced in May to four years in federal prison for disabling the computer systems of his former employer.  While admittedly

---

[15] Creswell, *et al*, footnote 12, *supra*.
[16] Elgin, *et al*, footnote 11, *supra*.

the post was from his youth, the employee once stated on his website "*I love to write and distribute viruses*."[17]

23.    Further, upon information and belief, Home Depot utilized weak password configurations and did not employ lockout security procedures[18] at its remote access points.  The failure to utilize lockout security procedures allowed hackers to utilize high-speed computers to gain access to Home Depot's system by guessing random combinations of usernames and passwords until a matching combination was found.  Upon information and belief, Home Depot also failed to segregate its POS networks from its larger corporate IT networks.

24.    Home Depot's failure to isolate its POS network allowed hackers to gain access to Home Depot's entire corporate IT network and obtain massive amounts of consumer information.

25.    After gaining access to Defendant's networks, hackers employed "RAM scraper" malware, similar to that used in the Target data breach of 2013, to gain access to the sensitive personal and financial information of consumers.[19]

---

[17] Sean Gallagher, "Home Depot's Former Security Architect Had History of Techno Sabotage." Ars Technica. (Sep. 22, 2014) (available at http://arstechnica.com/security/2014/09/home-depots-former-security-architect-had-history-of-techno-sabotage/).
[18] Lockout security procedures thwart hacker attempts to guess usernames and passwords by locking out IT addresses when multiple failed login attempts occur.
[19] Krebs, footnote 10, *supra*.

26.   The RAM scraper malware was installed on Home Depot POS terminals and Home Depot failed to detect its installation and/or failed to take appropriate steps to eliminate it.[20]  Following the installation of the RAM scraping malware, hackers were able to harvest consumer information from multiple POS locations.

27.   Hackers used RAM scraper malware to harvest this unencrypted information.  This information was then gathered and stored on the infiltrated network and thereafter shipped in batches to external servers, controlled by the hackers.

28.   RAM scraper malware has been used to attack POS terminals since 2011.

29.   RAM scraper malware has been used recently to attack large retailers such as Target, Sally Beauty, Neiman Marcus, Michaels Stores, and Supervalu.

30.   Home Depot was aware that RAM scraper malware is a real threat and is a primary tool of attack used by hackers.

---

[20] RAM scraper malware works as follows.  When a card is swiped or entered at a POS terminal, the terminal processes the card data unencrypted on its random access memory ("RAM") for a short time.  Hackers use RAM scraper malware, the type of malware installed on Home Depot's POS terminals, to harvest this unencrypted information.

31.     The U.S. Computer Emergency Readiness Team, a government unit within the Department of Homeland Security, has also alerted retailers to the threat of POS malware, and on July 31, 2014 issued a guide for retailers on protecting against the threat of POS malware.[21]

32.     Despite the fact that Home Depot was put on notice of the very real possibility of consumer data theft associated with its security practices and despite the fact that Home Depot knew or, at the very least, should have known about the elementary infirmities associated with its security systems, it still failed to make changes to its security practices and protocols.

33.     The above evidences a culture at Home Depot that was consistently antagonistic towards maintaining adequate security for the critically sensitive financial data used in its day-to-day commercial transactions.

**b. Home Depot Violated Multiple Industry Security Standards and State Statutes Articulating a Standard of Care for Protection of Consumer Data**

34.     Home Depot stores accept customer payment cards for the purchase of goods and services.  At the point of sale, these cards are swiped on a POS terminal, and a personal identification number or some other confirmation number is entered, or a receipt is signed to finish the transaction on behalf of the customer.

---

[21] https://www.us-cert.gov/ncas/alerts/TA14-212A

35.     Once the consumer enters his or her financial information via the POS terminal the transaction continues as follows: once the card is swiped, the merchant (*e.g.*, Home Depot) uses Payment Processing Networks (*e.g.*, Visa or MasterCard) to transmit a request for authorization to the institution which issued the payment card (*e.g.*, Plaintiff).  If the issuing institution authorizes the payment, the merchant electronically forwards a receipt of the transaction to another financial institution known as the "acquiring bank," which contracts with the merchant to process credit and debit card transactions.  The acquiring bank forwards the funds to the merchant to satisfy the transaction, and is then reimbursed by the card-issuing institution (Plaintiff).  The issuing institution posts the debit or credit transaction to its customer's account.

36.     Given the extensive network of financial institutions involved in these transactions and the sheer volume of daily transactions using credit and debit cards, it is unsurprising that financial institutions and credit card processing companies have issued rules and standards governing the basic measures that merchants must take to ensure consumers' valuable data is protected and also to protect the interests and resources of the financial institutions who are instrumental in facilitating these transactions.  First, the Payment Processing Networks issue regulations ("Card Operating Regulations") that are enforceable upon Home Depot

as a condition of Home Depot's contract with its acquiring bank.  The Card Operating Regulations prohibit Home Depot (or any merchant) from disclosing cardholder account numbers, personal information, magnetic stripe information, or transaction information to third parties other than the merchant's agent, the acquiring bank, or the acquiring bank's agents.

37.    Under the Card Operating Regulations, Home Depot was required to maintain the security and confidentiality of debit and credit cardholder information and magnetic stripe information and protect it from unauthorized disclosure.

38.    Similarly, the Payment Card Industry Data Security Standards ("PCI DSS") are a list of twelve information security requirements that were promulgated by the Payment Card Industry Security Standards Council. They apply to all organizations and environments where cardholder data is stored, processed or transmitted and require merchants like Home Depot to protect cardholder data, ensure the maintenance of vulnerability management programs, implement strong access control measures, regularly monitor and test networks, and ensure the maintenance of information security policies. As part of Home Depot's agreements with Visa and MasterCard, Home Depot represented that it would be compliant with PCI DSS. The twelve requirements are:

**Build and Maintain a Secure Network**

1) Install and maintain a firewall configuration to protect cardholder data

2) Do not use vendor-supplied defaults for system passwords and other security parameters

**Protect Cardholder Data**

3) Protect stored cardholder data

4) Encrypt transmission of cardholder data and sensitive information across open, public networks

**Maintain a Vulnerability Management Program**

5) Protect all systems against malware and regularly update anti-virus software or programs

6) Develop and maintain secure systems and applications

**Implement Strong Access Control Measures**

7) Restrict access to cardholder data by business need-to-know

8) Identify and authenticate access to system components

9) Restrict physical access to cardholder data

**Regularly Monitor and Test Networks**

10) Track and monitor all access to network resources and cardholder data

11) Regularly test security systems and processes

**Maintain an Information Security Policy**

12) Maintain a policy that addresses information security for all personnel[22]

39.   Home Depot's security flaws run afoul of best practices and industry standards.  Specifically, the security practices in place at Home Depot as alleged herein stand in stark contrast to the twelve PCI DSS core security standards.   All merchants are required to adhere to the PCI DSS as members of the payment card industry.

40.   Home Depot was at all times fully aware of its data protection obligations, which emanated from its participation in the payment card processing networks and its daily collection and transmission of tens of thousands of sets of payment card data.

41.   As a result of its participation in the payment card processing networks, Home Depot knew that, in each instance when it accepted payment cards for a purchase at one of its stores, its customers and the financial institutions which issued the payment cards to the customers were trusting that Home Depot would keep its customers' sensitive financial information secure from would-be data thieves.

---

[22] *PCI DSS Requirements and Security Assessment Procedures*, Version 3.0 at p. 5 (Nov. 2013) (available at https://www.pcisecuritystandards.org/documents/PCI_DSS_v3.pdf).

42.     Moreover, Home Depot knew that if it failed to secure its customers' sensitive financial information, the financial institutions issuing the payment cards to its customers, *i.e.*, Plaintiff and the members of the class, would suffer harm in the form of having to notify customers, close out and open new customer accounts, reissue customers' cards, and/or refund customers' losses resulting from the unauthorized use of their accounts, and additionally, suffer lost revenues as a result of decreased usage of their customers' debit/credit cards.

43.     In addition, Washington has enacted a statute requiring retailers to strictly comply with the PCI DSS.  Where retailers do not adhere to this industry-mandated standard of care, financial institutions may seek actual damages for costs incurred as a result of the retailer's noncompliance, where it affects cardholders residing in the state.[23]

### c. Home Depot Had a Duty to Plaintiffs to Prevent the Data Breach

44.     Home Depot knew that failing to protect customer card data would cause harm to the card-issuing institutions such as Plaintiff and the Class, because the issuers are financially responsible for fraudulent card activity and must incur significant costs to prevent additional fraud.  Indeed, Home Depot's public statements to customers after the data breach plainly state Home Depot's belief

---

[23] *See e.g.* Rev. Code Wash. § 19.255.020

that card-issuing institutions "are responsible" for fraudulent charges on cardholder accounts resulting from the data breach.[24]

45.    Home Depot, at all times relevant to this action, had a duty to Plaintiff and members of the Class to, and represented that it would: (a) properly secure payment card magnetic stripe information at the point of sale and on Home Depot's internal networks; (b) encrypt payment card data using industry standard methods; (c) use available technology to defend its POS terminals from well-known methods of attack; and (d) act reasonably to prevent the foreseeable harms to Plaintiff and the Class which would naturally result from payment card data theft.

46.    As a result of the events detailed herein – including Home Depot's noncompliance with standards mandated by both industry guidelines and state statute – the sensitive financial data of Plaintiff's and Class Members' customers are not only in the hands of thieves, but are brazenly being trafficked on black market websites.

---

[24] *See* Home Depot, "FAQs," Sept. 8, 2014, *available at* https://corporate.homedepot.com/MediaCenter/Documents/FAQs.pdf ("First, you will not be responsible for any possible fraudulent charges. The financial institution that issued your card or The Home Depot are responsible for those charges.").

47.    Accordingly, and as a result of Defendant's conduct, Plaintiff and Class Members experienced losses in the form of (a) cancelling and reissuing payment cards for customer accounts affected by the Home Depot Data Breach; (b) reimbursement of fraudulent charges or reversal of customer charges; (c) lost interest and transaction fees, including lost interchange fees; and (d) administrative expenses and overhead charges associated with monitoring and preventing fraud, as well as cancelling compromised cards and purchasing and mailing new cards to their customers.  These costs and expenses will continue to accrue as additional fraud alerts and fraudulent charges are discovered and occur.

48.    Plaintiff incurs these costs not simply to preemptively assuage its customers' concerns arising from the Home Depot Data Breach – although this is of paramount importance to Plaintiff – but also because it is Plaintiff, along with Class Members, who must bear the cost of any fraudulent charges made by thieves in possession of these compromised financial data.  Put another way: in situations such as these, where *over 56 million consumer accounts have been compromised and are being actively traded on the black market*, financial institutions become the *de facto* insurer of the negligent retailer.  While it is, of course, unfair to expect a consumer to bear costs arising from a crime that he or she was in no position to guard against, it is equally unfair to expect a financial institution – who is in no

better position to control the security protocols of a given retailer or to even be *aware* of security breaches suffered by a retailer – to incur costs arising from a retailer's negligence.  As stated to Congress by Frank Keating, the President and CEO of the American Bankers Association, in the wake of the 2013 Target data breach:

> **Banks Protect Consumers:** In breaches…, the banking industry's first priority is to protect consumers and make them whole. When a retailer…speaks of its customers having "zero liability" from fraudulent transactions, it is because our nation's banks are providing that relief, not the retailer that suffered the breach. It is often the case that banks must explain to their customers what has happened without the bank knowing where the breach has occurred. Moreover, bankers have historically received little meaningful reimbursement for the costs they have incurred.[25]

49.     Yet no appreciable changes in the security of retailers' POS machines or networks appear to have occurred.  Instead, Home Depot has taken pains to "emphasize that [consumers] will not be liable for any fraudulent charges" stemming from the Home Depot Data Breach.[26]  Such a statement, while true, is

---

[25] Frank Keating, American Bankers Association, Letter to members of the U.S. Senate and House of Representatives, "Target Data Breach" (Jan. 16, 2014) (available at http://www.aba.com/Advocacy/LetterstoCongress/Documents/DataSecurity-CongressMemoReTargetBreach-011614.pdf).

[26] "Customer Update on Payment Breach." (available at https://corporate.homedepot.com/MediaCenter/Pages/Statement1.aspx)

also disingenuous, as it fails to mention that this is so simply because *banks are required to cover losses arising from such types of fraud*.

50.    Moreover, left unchecked, these repeated failures on the part of retailers to adhere to industry-mandated standards of care will eventually erode consumer confidence.  Indeed, this is one of the immediate effects of a retailer data breach.[27]  Decline in financial institutions' card impact and card loyalty can be devastating to the institutions' revenue, and such variables are fueled by the customer's belief that the card at issue is a secure payment mechanism.

51.    Ultimately, then, Plaintiff and Class Members have suffered – and will continue to face – a panoply of threats, from the immediate and concrete, to the very long-term.

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil Procedures, individually and on behalf of all Members of the following classes (collectively referred to as "the Class" or "Class"):

> **National Class:** All financial institutions – including, but not limited to, banks and credit unions – in the United States (including its Territories and the District of

---

[27] Arte Levy, "Restoring the Faith: Rebuilding Consumer Confidence in the Wake of a Data Breach." Yahoo! Small Business Advisor (Feb. 19, 2014) (available at http://smallbusiness.yahoo.com/advisor/restoring-faith-rebuilding-consumer-confidence-wake-data-breach-175515514.html).

Columbia) that issue payment cards, including credit and debit cards, or perform, facilitate, or support card issuing services, whose customers made purchases from Home Depot stores from April 1, 2014 to the present.[28]

**Washington Sub-Class:** All financial institutions – including, but not limited to, banks and credit unions – that issue payment cards, including credit and debit cards, or perform, facilitate, or support card issuing services, whose Washington-resident customers made purchases from Home Depot stores from April 1, 2014 to the present.[29]

53.     Excluded from the Class are the following individuals and/or entities: Home Depot and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Home Depot has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

---

[28] At this time, it is unknown when or if the Home Depot Data Breach has ended. As the litigation progresses, the class definition may be amended as necessary to reflect the proper timeframe, should information become available that further clarifies the time period of the Home Depot Data Breach.
[29] *Id.*

54.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

55.     The Class is so numerous that joinder of all Members is impracticable. The number of separate individuals whose private financial data have been compromised as a result of the data breach described herein number at approximately 56 million, making the number of affected financial institutions – all of whom are members of the proposed Class – number in at least the thousands.

56.     There are questions of law and fact common to all members of the Class, the answers to which will advance the resolution of the claims of the Class members and that include, without limitation:

        a)     Whether Defendant failed to provide adequate security and/or protection for its computer systems containing customers' financial and personal data;

        b)     Whether the conduct of Defendant resulted in the unauthorized breach of its computer systems containing customers' financial and personal data;

        c)     Whether Defendant failed to encrypt customer payment card data;

d)    Whether Defendant improperly retained customer personal and financial information or allowed such information to be retained on its systems;

e)    Whether Defendant owed a duty to Plaintiff and the Class;

f)    Whether the harm to Plaintiff and the Class was foreseeable;

g)    Whether the actions of Defendant, described herein, were the legal cause of the injuries sustained by Plaintiff and the Class;

h)    Whether Defendant's failed to take "reasonable care" within the meaning of Rev. Code Wash. § 19.255.020;

i)    Whether Defendant's actions violated Rev. Code Wash. § 19.86.010, *et seq.*;

j)    Whether Plaintiff and members of the Class are entitled to injunctive relief; and

k)    Whether Plaintiff and members of the Class are entitled to damages and the measure of such damages.

57.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff and Class Members experienced losses, as a result of Defendant's conduct, in the form of reissuing debit cards and refunding fraudulent charges for accounts

affected by the Home Depot Data Breach, as well as incurring costs for the notification of its customers.

58.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with the interests of the Class Members. Furthermore, Plaintiff has retained competent counsel experienced in class action litigation.  Plaintiff's counsel will fairly and adequately protect and represent the interests of the Class.

59.    Plaintiff asserts that pursuant to Fed. R. Civ. P. 23(b)(3), questions of law or fact common to the Class Members predominate over any questions affecting only individual Members.

60.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Even if Class Members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, and considering that the parties affected by the Home Depot Data Breach number in the tens of millions or greater, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which may otherwise go

unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT ONE
### NEGLIGENCE
### (Brought on behalf of the Class)

61.    Plaintiff incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

62.    Defendant owed a duty to Plaintiff and the Class to use and exercise reasonable and due care in obtaining and processing Plaintiff's customers' personal and financial information.

63.    Defendant owed a duty to Plaintiff and the Class to provide adequate security to protect their mutual customers' personal and financial information.

64.    Defendant breached its duties by (1) allowing a third-party intrusion into its computer systems; (2) failing to protect against such an intrusion; (3) failing to detect the intrusion for a period of five or more months; (4) allowing the personal and financial information of customers of Plaintiff and the Class to be accessed by third parties on a massive scale.

65.    Defendant knew or should have known of the risk that its POS terminals could be attacked using methods similar or identical to those previously used against major retailers in recent months and years.

66.    Defendant knew or should have known that its failure to take reasonable measures to protect its POS terminals against obvious risks would result in harm to Plaintiff and the Class.

67.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and the Class have suffered substantial injuries and costs and will incur future injuries and costs, associated with protecting its customers' accounts, particularly in the form of reissuing payment cards to replace payments cards rendered valueless and useless by Home Depot's acts and omissions, providing notice to customers, and refunding fraudulent charges associated with bank accounts of customers who used their cards at Home Depot during the Home Depot Data Breach.  In addition, the Home Depot Data Breach has caused, and will continue to cause, Plaintiff and the Class to lose revenue as a result of a decrease in card usage after the breach was disclosed to the public.

## COUNT TWO
## NEGLIGENT MISREPRESENTATION BY OMISSION
### (Brought on behalf of the Class)

68.     Plaintiff incorporates and re-alleges all allegations above as if fully set forth herein.

69.     Through its acceptance of credit and debit payment cards and participation in the payment card processing system, Home Depot held itself out to Plaintiff and the Class as possessing and maintaining adequate data security measures and systems that were sufficient to protect the personal and financial information of shoppers using credit and debit cards issued by Plaintiff and the Class.

70.     Home Depot further represented that it would secure and protect the personal and financial information of shoppers using credit and debit cards issued by Plaintiff and the Class by agreeing to comply with both Card Operating Regulations and the PCI DSS.

71.     Home Depot knew or should have known that it was not in compliance with the requirements of Card Operating Regulations and the PCI DSS.

72.     Home Depot knowingly and deliberately failed to disclose material weaknesses in its data security systems and procedures that good faith required it to disclose to Plaintiff and the Class.

73.     A reasonable business would have disclosed information concerning material weaknesses in its data security measures and systems to Plaintiff and the Class.

74.     Home Depot also failed to exercise reasonable care when it failed to timely communicate information concerning the data breach that it knew, or should have known, compromised the personal and financial information of customers using credit and debit cards issued by Plaintiff and the Class.

75.     Home Depot's failure to disclose its inadequate security systems was particularly egregious in light of the highly publicized, similar data breaches at other national retailers in the months preceding the Home Depot Data Breach.

76.     Had Plaintiff and the Class known that Home Depot was not compliant with the Card Operating Regulations and the PCI DSS, Plaintiff and the Class would have either taken action to prevent their cards from being used for electronically processed purchases at Home Depot or required Home Depot to take immediate corrective action.

77.    As a direct and proximate result of Home Depot's negligent misrepresentation by omission, Plaintiff and the Class have suffered substantial injuries and costs and will incur future injuries and costs, associated with protecting its customers' accounts, particularly in the form of reissuing payment cards to replace payments cards rendered valueless and useless by Home Depot's acts and omissions, providing notice to customers, and refunding fraudulent charges associated with bank accounts of customers who used their cards at Home Depot during the Home Depot Data Breach.  In addition, the Home Depot Data Breach has caused, and will continue to cause, Plaintiff and the Class to lose revenue as a result of a decrease in card usage after the breach was disclosed to the public.

## COUNT THREE
### VIOLATION OF REV. CODE WASH. § 19.255.020
### (Brought on behalf of the Washington Sub-Class)

78.    Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

79.    The Washington Legislature, in an effort to combat cybercrime and to protect financial institutions from negligent practices of retailers, enacted Rev. Code Wash. § 19.255.020, which states in pertinent part:

> If a processor or business fails to take reasonable care to
> guard against unauthorized access to account information

that is in the possession or under the control of the business or processor, and the failure is found to be the proximate cause of a breach, the processor or business is liable to a financial institution for reimbursement of reasonable actual costs related to the reissuance of credit cards and debit cards that are incurred by the financial institution to mitigate potential current or future damages to its credit card and debit card holders that reside in the state of Washington as a consequence of the breach, even if the financial institution has not suffered a physical injury in connection with the breach.

80.     Plaintiff and Washington Sub-Class Members are "financial institutions" within the meaning of Rev. Code Wash. § 19.255.020.

81.     Defendant is a "business" within the meaning of Rev. Code Wash. § 19.255.020.

82.     The information compromised in the Home Depot Data Breach was "account information" within the meaning of Rev. Code Wash. § 19.255.020.

83.     Defendant failed to take reasonable care to guard against unauthorized access of account information by, *inter alia*, aspiring to "C-level" (as opposed to "A-level" or "B-level") IT security, failing to thoroughly and consistently audit its networks, utilizing an outdated – and thus vulnerable – operating system for its POS terminals, neglecting the advice of its security consultants and refusing to enable multiple intrusion detection features native to its security software, and failing to encrypt a single card-based customer transaction.  Such actions fail to

comply with the standards put forth by the PCI DSS, which standards Defendant must abide by in order to exercise reasonable care.

84.     Such failure to take reasonable care on the part of Defendant led to Plaintiff and Washington Sub-Class Members to incur costs associated with mitigating against fraud affecting their customers, arising from Defendant's wrongful acts.

85.     Pursuant to Rev. Code Wash. § 19.255.020, Plaintiff and Washington Sub-Class Members are entitled to reasonable actual costs related to the reissuance of credit cards and debit cards incurred to mitigate potential current or future damages to credit card and debit card holders that reside in the state of Washington as a consequence of the breach.

## COUNT FOUR
### VIOLATION OF REV. CODE WASH. § 19.86.010, *ET SEQ.*
### (Brought on behalf of the Washington Sub-Class)

86.     Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

87.     Home Depot's policies and practices relating to its sub-standard security measures for the use and retention of its customers' financial information are violations of Washington's Uniform Deceptive Trade Practices Act ("UDTPA"), Rev. Code Wash. § 19.86.010, *et seq.*

88.     Specifically, Home Depot violated, and continues to violate, the UDTPA by failing to take proper precautionary measures with its payment card processing machines, evidenced *inter alia* by its failure to comply with the PCI DSS.

89.     Similarly, Home Depot violated, and continues to violate, the UDTPA by failing to put a fulsome notification policy in place, where customers' financial information is compromised as a result of a data breach.

90.     Plaintiff and the Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the UDTPA.

91.     As a result of Home Depot's violations of the UDTPA prohibiting unfair and deceptive acts and practices, Plaintiff and members of the Classes have suffered monetary damages for which the Bank is liable.

92.     As redress for Home Depot's repeated and ongoing violations of these consumer protection statutes, Plaintiff and the Classes are entitled to, *inter alia*, actual damages, exemplary damages, attorney's fees, and injunctive relief.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, individually and on behalf of the Class, demands a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendant and in favor of Plaintiff and the Class and award the following relief:

A. That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as representative of the Class and Plaintiff's counsel as counsel for the Class;

B. Monetary damages;

C. Injunctive Relief;

D. Reasonable attorneys' fees and expenses, including those related to experts and consultants;

E. Costs;

F. Pre- and post- judgment interest; and

1. Such other relief as this Court may deem just and proper.

DATED:     September   30, 2014

Respectfully submitted,

By:  /s/ Thomas A. Withers
Thomas A. Withers
Georgia Bar No. 772250
**GILLEN WITHERS & LAKE, LLC**
8 East Liberty Street
Savannah, Georgia 31412
Tel:   (912) 447-8400
Fax:   (912) 233-6584
twithers@gwllawfirm.com

Hank Bates
Allen Carney
David Slade
(all to be admitted *pro hac vice*)
**CARNEY BATES & PULLIAM, PLLC**
11311 Arcade Drive
Little Rock, AR 72212
Telephone:  501.312.8500
Facsimile:  501.312.8505
hbates@cbplaw.com
acarney@cbplaw.com
dslade@cbplaw.com

Jeffrey D. Boyd
Deborah M. Nelson
(all to be admitted *pro hac vice*)
**NELSON BOYD, PLLC**
411 University Street, Suite 1200
Seattle, WA 98101
Telephone: 206.971.7601
boyd@nelsonboydlaw.com
nelson@nelsonboydlaw.com

*Attorneys for Plaintiff Umpqua Bank*

## **<u>CERTIFICATION</u>**

The undersigned hereby certifies, pursuant to Local Civil Rule 7.1D, that the

foregoing document has been prepared with one of the font and point selections

(Times New Roman, 14 point) approved by the Court in Local Civil Rule 5.1B.

/s/ Thomas A. Withers
Thomas A. Withers
Georgia Bar No. 772250
**GILLEN WITHERS & LAKE, LLC**
8 East Liberty Street
Savannah, Georgia 31412
Tel:   (912) 447-8400
Fax:   (912) 233-6584
twithers@gwllawfirm.com
